NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARIANNA NASYROVA, | Civil Action No. 14-1269 (SRC) |
| Plaintiff, | **OPINION** |
| v. | |
| IMMUNOMEDICS, INC., CYNTHIA L. SULLIVAN, and GERARD G. GORMAN, | |
| Defendants. | |

**CHESLER**, District Judge

This matter comes before the Court on Defendants' motion to dismiss the Amended Class Action Complaint for Violations of Federal Securities Laws (hereinafter, the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). Lead Plaintiff John Neff and Named Plaintiff John Robustello (collectively, "Plaintiffs") have opposed the motion. The Court has considered the papers filed by the parties and, pursuant to Federal Rule of Civil Procedure 78, will rule on the motion without oral argument. For the reasons expressed below, Defendants' motion will be granted.

### I.   BACKGROUND

This is a securities fraud class action filed on behalf of shareholders who bought the common stock of Defendant Immunomedics, Inc. ("Immunomedics") between May 9, 2013 and October 9, 2013, inclusive (hereinafter, the "Class Period"). According to the Complaint, Immunomedics "is a New Jersey-based biopharmaceutical company primarily focused on the

development of monoclonal antibody-based products for the targeted treatment of cancer, autoimmune and other serious diseases." (Compl., ¶ 17.)  In July 2008, Immunomedics entered into a License and Collaboration Agreement (the "Agreement") with a company then known as Nycomed GmbH, and later acquired by Takeda Pharmaceutical Company (hereinafter referred to as "Takeda-Nycomed").  Individual Defendants Cynthia Sullivan ("Sullivan") and Gerard Gorman ("Gorman") were at all relevant times officers of Immunomedics, each of whom signed filings made by the company with the Securities and Exchange Commission ("SEC").  The essence of the fraud alleged is that Defendants misled investors by failing to disclose that Takeda-Nycomed breached the Agreement, Takeda-Nycomed failed to cure its breach within the time allowed by the Agreement and that submission of the dispute to arbitration was imminent. As a result of these omissions, the Complaint alleges, Plaintiffs and others similarly situated to them paid artificially inflated prices for the Immunomedics stock they purchased during the Class Period because the public was unaware of the precarious state of the Agreement.

Before turning to the factual allegations on which the securities fraud claims are based, the Court will, for context, review the portions of the Agreement relevant to this lawsuit. Under the Agreement, Immunomedics granted Takeda-Nycomed an exclusive worldwide license in connection with one of Immunomedics's key products, a therapeutic compound known as Veltuzumab, for the purpose of completing the clinical development, manufacturing and commercializing of the product for the treatment of all non-cancer indications.  In essence, the contractual relationship between licensor Immunomedics and licensee Takeda-Nycomed was critical to bringing Veltuzumab to the non-oncological market and thus realizing revenue from the product.  The Agreement called for licensee Takeda-Nycomed to pay Immunomedics

milestone payments upon achieving certain clinical, regulatory and sales milestones with regard to Veltuzumab, as well as royalties.

The Agreement contemplated that, in the course of performance, the parties may have disputes regarding the Agreement, including disputes concerning a breach or alleged failure to perform.  In that regard, Article 17 of the Agreement set forth a process and timetable for dispute resolution, which starts with written notice of the dispute from one party to the other and culminates in arbitration, to which the parties agreed to submit in the event they were unable to resolve the dispute within 60 days of the written notice. (Agreement, Art. 17.2, 17.3.)  The Agreement also provided, in a separate article regarding the bases for termination, that in the event of a material breach, either party may terminate the Agreement.  Under Article 14, termination for breach required that the non-breaching party first give the breaching party written notice of termination.  It further provided that such termination does not become effective immediately. Rather, the written notice issued by the non-breaching party would initiate a cure period during which the breaching party has an opportunity to cure the default.  The Agreement provided that a termination for breach "shall become effective" at the end of the cure period unless the breach of default had been cured prior to the cure period's expiration.

The Complaint at issue in this motion to dismiss alleges that on May 14, 2013, "unbeknownst to investors, Immunomedics provided Takeda-Nycomed with a formal notification that, as a result of delays in the development in Veltuzumab, it considered Takeda-Nycomed to be in 'material breach' of the Agreement and that the Agreement would terminate if the breach remained uncured."  (Compl., ¶ 27.)  It further alleges that in the days before and for a period after it provided notice of the breach, Immunomedics issued numerous public statements, through press releases, conference calls and SEC filings, which all failed to disclose the delays in

development of Veltuzumab, the deteriorating relationship between Immunomedics and Takeda-Nycomed and, after it was issued, the formal notice of material breach sent by Immunomedics to Takeda-Nycomed on May 14, 2013.  In particular, Plaintiffs identify SEC Form 10-Q, signed by Defendants Sullivan and Gorman and filed May 8, 2013 (the "May 10-Q"), as well as a press release issued that same day, which, Plaintiffs contend, failed to disclose "material changes in the Company's risk factors," in light of the existing dispute which led Immunomedics to issue the notice of breach just days later.  (Compl., ¶ 45.)  On August 22, 2013, Immunomedics filed its SEC Form 10-K for the fiscal year ended June 30, 2013 (the "August 10-K").  Again, the Complaint avers, the August 10-K was misleading because it omitted any mention of the state of the Agreement and/or the dispute with Takeda-Nycomed relating to Veltuzumab, even though by that time, Plaintiffs allege, the time in which to cure the breaches noticed in May had expired and Immunomedics was on the verge of initiating arbitration proceedings against Takeda-Nycomed.

In September 2013, Immunomedics indeed initiated arbitration proceedings against Takeda-Nycomed in an effort to resolve the dispute concerning the breach noticed in May 2013. Shortly after it initiated arbitration, Immunomedics was advised by Takeda-Nycomed on October 3, 2013 that Takeda-Nycomed "considers the Agreement to be terminated."  (Oct. 9, 2013 Form 8-K, Pendleton Ex. J; see also Compl., ¶ 54.)  On October 9, 2013, Immunomedics filed a form 8-K with the SEC and issued a press release, both of which announced that the Agreement had been terminated.  It was at this time that Immunomedics made the following disclosures: that in 2012 it had notified Takeda-Nycomed "of its concern about delays in the Product's advancement; " that it had issued a formal notice of breach to Takeda-Nycomed on May 14, 2013 stating that the Agreement would terminate if the breach remained uncured; that it had initiated arbitration proceedings in September 2013 related to the breach; and that Takeda-

Nycomed advised Immunomedics on October 3, 2013 that it considered the Agreement to be terminated.

The Complaint alleges that upon disclosure of that adverse news, the price of Immunomedics common stock dropped $ .35 per share, or 5.88%, on very heavy trading volume to close at $5.60 per share on October 9, 2013.  It further alleges that the previous day, October 8, Immunomedics stock dropped $ .80 per share, or 11.85%, on very heavy trading volume, as news of the Agreement's termination leaked into the market.

Plaintiffs allege that Immunomedics withheld material information from the public regarding the precarious state of the relationship between it and Takeda-Nycomed, in particular that the Agreement had been materially breached, that the period to cure the breach had expired and that, at the time it filed the August 10-K, Immunomedics was about to initiate arbitration regarding the breach.  Plaintiffs further allege that the omissions misled investors regarding the viability of the Agreement in light of the company's affirmative positive statements about Veltuzumab's development and commercial potential.  During this same time period as the Agreement was in jeopardy, the Complaint alleges, Immunomedics "touted a new, and more commercially lucrative, direction in the development of Veltuzumab, and indicated that a trial was under preparation[.]" (Compl., ¶ 43.)  For example, in the May 10-Q, Immunomedics stated, in relevant part, as follows:

> During this quarter, Takeda-Nycomed's management approved the strategic decision to   pursue clinical in systemic lupus erythematosus (SLE) as the lead indication with subcutaneous veltuzumab . . . . This decision to proceed with the SLE indication as opposed to the rheumatoid arthritis (RA) indication comes after careful analysis of the current RA market.  Takeda-Nycomed believes that although subcutaneous veltuzumab should be safe and effective in patients with RA, it is a crowded market . . . . Conversely, the SLE market has fewer therapeutic options for patients.

(Id., ¶ 46.)  Similar statements regarding Takeda-Nycomed's transition from pursuing

development of Veltuzumab for the RA market to pursuing clinical development for SLE as the

lead indication for the product were made in the May 10-Q, the May 8 press release, a

conference call held on May 9, 2013 and the August 10-K.

Based on Defendants' allegedly wrongful failure to disclose information regarding the

breach and thus increased risk regarding the viability of the Agreement, the Complaint asserts

two claims. Plaintiffs seek relief under § 10(b) of the Securities and Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § 78j(b).  They also assert a claim against individual Defendants

Sullivan and Gorman for control person liability, pursuant to Exchange Act § 20(a), 15 U.S.C. §

78t(a).  Defendants move to dismiss the Complaint in its entirety.


## II.  DISCUSSION

### A.  Standard of Review

The issue before the Court on a Rule 12(b)(6) motion to dismiss "is not whether plaintiff

will ultimately prevail but whether the claimant is entitled to offer evidence in support of the

claims."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).   To make that determination, the Court must

employ the standard of review articulated by the Supreme Court in Bell Atlantic Corp. v.

Twombly and Ashcroft v. Iqbal.  A complaint will survive a motion under Rule 12(b)(6) only if

it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is

plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic v.

Twombly, 550 U.S. 544, 570 (2007)).  The plausibility standard will be met if the complaint

"pleads factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556.)  While the complaint need not demonstrate that a defendant is probably liable for the wrongdoing to meet the pleading standard of Federal Rule of Civil Procedure 8(a), allegations that give rise to the mere possibility of unlawful conduct will not do.  Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 557.

Claims brought pursuant to Exchange Act § 10(b) and the statute's implementing regulation, SEC Rule 10b-5, are subject to certain heightened pleading requirements under the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320-21 (2007) (noting that prior to the enactment of the PSLRA, the pleading standard of Rule 9(b) governed the sufficiency of a complaint for securities fraud). To survive a motion to dismiss, the complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(1) & (2); 15 U.S.C. § 78u-4(b)(3)(2) ("In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of [15 U.S.C. §§ 78u-4(b)(1) & (2)] are not met.").

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must consider the complaint in its entirety.  Tellabs, 551 U.S. at 322.  It is also proper to consider "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice."  Id.

**B.     Securities Fraud Claim Under § 10(b) of the Exchange Act**

Under § 10(b) of the Exchange Act, a person or entity may not "use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b).  SEC Rule 10b-5(b), in turn, makes it unlawful to "make any untrue statement of material fact or to omit to state a material fact in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b)(2).   The Supreme Court has recognized a private cause of action for damages sustained as the result of a violation of Section 10(b) and Rule 10b-5 and held that such claim requires a plaintiff to establish the following six elements:

> (1) a material misrepresentation or omission;

> (2) scienter, i.e., a wrongful state of mind;

> (3) a connection with the purchase or sale of a security;

> (4) reliance, also known as "transaction causation" in cases involving public securities markets;

> (5) economic loss; and

> (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss.

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); see also McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424 (3d Cir. 2007).

The Rule 10b-5 violation alleged in the Complaint is grounded in the omission of information.  Essentially, the Complaint alleges that Defendants deceived investors by failing to timely disclose that Immunomedics had become dissatisfied with Takeda-Nycomed's delays in

performing under the Agreement and, as a result of this dissatisfaction, had notified Takeda-Nycomed that it was in "material breach" of the Agreement, which Immunomedics would terminate unless the breach was cured.  Immunomedics ultimately initiated arbitration proceedings under the Agreement, following which Takeda-Nycomed, the breaching party, advised that it considered the Agreement to be terminated.  Upon receiving Takeda-Nycomed's notice, Defendants filed an SEC Form 8-K reporting this fact.  Plaintiffs' claim thus boils down to a contention that Defendants were obligated under Rule 10b-5 to publicly disclose Immunomedics's growing dissatisfaction with Takeda-Nycomed in their joint endeavor to develop Veltuzumab and that such disclosure should have been made prior to the time Takeda-Nycomed, the party which was allegedly in breach of the Agreement, informed Immunomedics that it regarded the Agreement as "terminated."

Among their various arguments, Defendants maintain that the Section 10(b) claim must be dismissed because the Complaint fails to plead an actionable omission.  They argue that Plaintiffs do not, and cannot point to an obligation of disclosure as to a dispute raised by Immunomedics concerning Takeda-Nycomed's delays under the Agreement and/or the contracting parties' ongoing negotiations to resolve their dispute.  While Defendants acknowledge that termination of the Agreement would trigger an obligation of disclosure—and emphasize that, as alleged by Plaintiffs, they promptly disclosed the fact that Takeda-Nycomed notified that it considered the Agreement terminated—they maintain that they had no duty to advise the public of their efforts to address Takeda-Nycomed's inadequate performance under the Agreement. Defendants are correct.

It is well-established that "mere possession of nonpublic information" does not suffice to assert an omission-based securities fraud claim.  <u>Chiarella v. United States</u>, 445 U.S. 222, 235

(1980); see also Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1039, 1321 (2011) (holding that "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information."). To plead an actionable securities fraud violation based on nondisclosure, a plaintiff must allege that the defendant was under a duty to disclose the information. Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("To be actionable, of course, a statement must also be misleading. Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); see also Chiarella, 445 U.S. at 235 (holding, in the context of a Section 10(b) and Rule 10b-5 action, that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak . . . ."); Oran v. Stafford, 226 F.3d 275, 285 (3d Cir. 2000) (holding that "non-disclosure of information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information."). "Such duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." Oran, 226 F.3d at 285-86.

Defendants correctly argue that Plaintiffs fail to point to any affirmative legal obligation of disclosure as to the allegedly concealed information regarding Takeda-Nycomed's breach of the Agreement. In other words, they cite no statute, regulation or other binding authority which mandates that a company disclose disagreements in the course of a contract's performance, or as is specifically the case here, Immunomedics's position that Takeda-Nycomed had failed to perform as required due to delays in the development of Veltuzumab. The absence of a disclosure requirement regarding the status of a business relationship, prior to actual termination of a contract, is highlighted, Defendants point out, by the explicit requirement to report such an event in SEC Form 8-K's Item 1.02, entitled "Termination of a Material Definitive Agreement."

Plaintiffs concede that the Agreement was not terminated upon the May 14, 2013 notice of breach issued by Immunomedics to Takeda-Nycomed.  They nevertheless argue that, in light of the significance of the Agreement to Immunomedics, Defendants were under an obligation to disclose "the existence of a major dispute or uncertainty in a key business relationship."  (Opp'n at 10.)  This duty, they maintain, is based on the premise that disclosure is required if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available," as the Second Circuit held in In re Time Warner Inc. Securities Litigation.  9 F.3d 259, 267-68 (2d Cir. 1993).  Plaintiffs' reliance on the Second Circuit's discussion in Time Warner is, however, misplaced.  A review of the opinion itself reveals that the Second Circuit so held in describing when non-disclosed information can be considered "material," which, it observed is typically a distinct inquiry from the existence of a duty to disclose information.  Id. at 267.  The inquiries coalesce, the Time Warner court further held, only in a situation where the duty to speak arises from the necessity of making a *prior statement* not misleading.  Id. at 268.  Put differently, the court reasoned that if, after a corporation has spoken on a subject, new information arises that a reasonable investor would view as altering the total mix of information available, then disclosure of that new information is required to render the prior statement not misleading.  Id. at 268.  Thus, the Time Warner discussion is consistent with the Third Circuit's jurisprudence that a duty of disclosure under Section 10(b) and Rule 10b-5 arises when there has been "an inaccurate, incomplete or misleading prior disclosure."  Oran, 226 F.3d at 285-86.

Plaintiffs go on to discuss three other cases which they contend demonstrate that courts of other jurisdictions have recognized that, in some circumstances, an obligation of disclosure may arise when an established business relationship of a publicly-traded company is in danger of

breaking down, that is, before the relationship is actually terminated.  The cases, however, each present distinct scenarios from the factual allegations made in the Complaint against Immunomedics.  Moreover, their analyses are buttressed by the same principle that, under securities law, disclosure is required to update or correct a prior statement made by a corporate defendant.  The Court will review the cases briefly to highlight the distinctions.

First, in Hi-Crush Partners L.P. Securities Litigation, the district court denied the defendant's motion to dismiss a § 10(b) claim based on its alleged failure to disclose a contract dispute with a major commercial partner.  In re Hi-Crush Partners L.P. Sec. Litig., No. 12 Civ. 8557 (CM), 2013 WL 6233561, at *13-14 (S.D.N.Y. Dec. 2, 2013).  Two factual allegations were critical to the court's reasons for holding that the omissions-based claim was sufficiently pled.  One, the plaintiff had alleged that the customer had formally notified defendant Hi-Crush by letter that "it was *terminating* the agreement" due to the defendant's breach, notwithstanding the defendant's dispute of the validity of the assertion of breach.  Id. at *14 (emphasis added). Two, the plaintiff alleged that defendant Hi-Crush "had publicly hyped the importance of its relationship with [the customer]" both before and after the customer terminated the contract, including making express and specific statements about the relationship and its contribution to Hi-Crush's "long-term cash flow stability."  Id.

Next, Plaintiffs point to the Eastern District of New York's decision in Hutchins v. NBTY, Inc. as authority in support of their argument regarding the duty to disclose.  Hutchins v. NBTY, Inc., No. CV 10-2159 (LDW) (WDW), 2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012). In Hutchins, the defendant NBTY had been an exclusive supplier of Wal-Mart for nutritional supplements for a period of ten years but was then advised that Wal-Mart would switch to a competitive bidding process for the products.  Id. at *1. The Section 10(b) claim in that case was

premised on NBTY's failure to disclose the news even though, the plaintiffs alleged, NBTY knew that the bidding initiative would have an adverse impact on the company's gross margins, either because NBTY would have to lower their prices to maintain the Wal-Mart business or because it might lose the business altogether.  Id.  The Hutchins court found the omissions actionable "in light of statements made" by NBTY.  Id. at *6.  In particular, defendant NBTY had made affirmative statements in a press release, issued after it learned of the Wal-Mart bidding process, touting its most recent gross margin figures as "indicative of its ongoing performance" and, according to the district court, later "again stated publicly that NBTY's recently reported gross margins were sustainable."  Id. at *1.

Finally, the factual scenario in Globus v. Law Research Service is completely inapposite.  See Globus v. Law Research Svc., Inc., 418 F.2d 1276 (2d Cir. 1969).  There, the defendant's public offering materials had promoted the defendant's contractual arrangement with another company for the supply of services.  Id. at 1280.  Prior to the offering, however, some of the services to be provided under that contract had been terminated by the supplier and the defendant had in fact filed suit against the supplier.  Id.  The Globus court noted that "[t]he offering circular failed to mention or even suggest the events of January 29 [the supplier's termination of a portion of the agreement and the defendant's initiation of a lawsuit against the supplier] or the dispute between [defendant] LRS and its supplier had occurred."  Id. at 1282.

In short, the various decisions on which Plaintiffs rely involve prior statements and/or contracts that have in fact been terminated or repudiated.  The decisions are not only not binding upon this Court, they are not persuasive.  The Complaint in this action does not allege that Immunomedics made explicit statements regarding the durability of the Takeda-Nycomed

contract, guaranteeing future revenues from the Agreement or otherwise assuring results with respect to the clinical and commercial development of Veltuzumab.[1]

 The only statement characterized by Plaintiffs as inaccurate or misleading due to the failure to disclose the May 2013 notice of breach in fact does nothing more than report that Takeda-Nycomed decided to concentrate development of Veltuzumab for a different indication than originally planned.  Plaintiffs do not contend that such statement was false.  Rather they maintain the statement is misleading because it infers that the Agreement is proceeding without incident and touts collaboration between Immunomedics and Takeda-Nycomed, messages inconsistent with the deteriorating relationship.  This characterization stretches the statement beyond recognition.

 Plaintiffs also repeatedly note that according to the August 10-K filed by Immunomedics, the company's "only significant sources of revenue in recent years have been derived from our existing licensing agreements with UCB and Takeda-Nycomed," thus reinforcing, according to Plaintiffs, the importance to investors of any information which concerns the relationship with Takeda-Nycomed.  This argument is unavailing.  That the Agreement presented a significant and substantial source of revenue does not render Defendants' silence about the breach actionable. "A corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  In re Burlington, 114 F.3d at 1432.  Moreover, the August 10-K states, in the same section it identifies the Agreement as a major component of revenue for Immunomedics, as follows: "If we are unable to develop commercially viable therapeutic

---

[1] Indeed, as Defendants have noted, SEC filings made by Immunomedics consistently cautioned that failure by Takeda-Nycomed to perform as required or to progress with clinical trials as contemplated by the parties would severely jeopardize commercialization of Veltuzumab.  In fact, the 10-K filings for fiscal years 2009 through 2013 – which are expressly referenced in the Complaint – warned that if the Agreement was terminated for any reason, "it is likely we would never receive any of the milestone payments or royalties that we are able to receive under our agreements with Nycomed and UCB . . . ."  (See, e.g., August 10-K, Pendleton Decl. Ex. I at 19.)

products or to license them to third parties, it is likely that we will never achieve significant revenues or become profitable, either of which would jeopardize our ability to continue as a going concern." (Pendleton Decl., Ex. I at 16.)  This statement belies Plaintiffs' argument that Immunomedics had to disclose its dispute with Takeda-Nycomed and related increase risk to the viability of the Agreement so as to update a prior statement on risk which was no longer accurate.

Plaintiffs further argue that, even if the Court accepts Defendants' position that the May 14, 2013 notice of breach did not trigger a disclosure obligation, the Complaint nevertheless pleads a plausible securities fraud claim.  In their opposition brief, Plaintiffs argue that there are two alternative dates on which the duty to disclose was triggered: either when the contractual cure period expired without resolution of the dispute or, at the latest, when, according to Plaintiffs, the Agreement automatically terminated per its own terms.  These dates, however, continue to represent points in time prior to the actual termination of the Agreement.

Expiration of the cure period occurred, Plaintiffs contend, on July 13, 2013, or 60 days from the date the notice of breach was issued.  According to Plaintiffs, the significance of this event is grounded in the Agreement itself, which provides in Article 17.2 that after a notice of breach is issued, the breaching party has only 60 days to cure the breach before the dispute must be submitted to arbitration.  This argument is unavailing because, as discussed earlier in this Opinion, Plaintiffs proffer no authority for the proposition that a pre-termination contractual dispute triggers a duty of disclosure under Section 10(b) and Rule 10b-5.  Article 17.2 of the Agreement indeed establishes a dispute resolution framework that begins with a phase in which the parties may work privately to resolve the dispute and, if they are unsuccessful, directs that the dispute be turned over to an arbitrator.  The Complaint in fact alleges that the dispute between

Immunomedics and Takeda-Nycomed was submitted to arbitration in September 2013.  There is simply no indication, either in the language of Article 17 or in the actual dealings between the parties, that the fact of reaching the date on which private negotiations were to transition to a different phase of dispute resolution altered the circumstances related to the Agreement. Plaintiffs do not contend that the Agreement was terminated as of this point in time, and in fact, their allegations demonstrate that efforts to resolve the dispute remained ongoing.

The second alternative date on which the duty to disclose was triggered, Plaintiffs argue, was August 12, 2013, 90 days after Immunomedics issued the notice of breach.  On that date, Plaintiffs maintain, the Agreement automatically terminated by operation of Article 14.2 of the Agreement, which provides that a termination "shall become effective" 90 days after notice of termination has been issued by the non-breaching party.  This argument is barely developed in Plaintiffs' opposition brief and not addressed in Defendants' reply.  The Court nevertheless addresses it so as to provide the Complaint with the most generous reading regarding the claim that Defendants' failed to disclose termination of the Agreement in violation of securities fraud laws.  Plaintiffs invoke Article 14.2 despite its inconsistency with the Complaint's allegations regarding the dispute resolution process in which Immunomedics was admittedly engaged through September 2013 pursuant to Article 17 of the Agreement.  The Complaint consistently alleges that on May 14, 2013 Immunomedics notified Takeda-Nycomed that it was in "material breach" of the Agreement and that the Agreement would terminate if the breach remained uncured.  The Complaint does not allege that Immunomedics terminated the Agreement in its May 14, 2013 notice or even attempted to do so.  It alleges, to the contrary, that Immunomedics, the non-breaching party, had been attempting to preserve its contractual relationship with Takeda-Nycomed by means of arbitration after August 12, 2013 and never purported to give a

"notice of termination."  Article 14.2 applies when the non-breaching party has sought to terminate the Agreement, requiring that written notice and an opportunity to cure be given to the breaching party.  While Plaintiffs now seek to avail themselves of Article 14.2's effective date of termination, this attempt to thwart the motion to dismiss fails for lack of support in the factual allegations of the Complaint.

While the Complaint obscures the situation, the allegations belie Plaintiffs' perspective that the relationship between Immunomedics and Takeda-Nycomed was in jeopardy of dissolution.  Immunomedics gave notice that the other party to the Agreement, Takeda-Nycomed, was not performing as required and thus in violation of the Agreement.  It was Immunomedics, as the non-breaching party, which was in a position under the Agreement to terminate it by reason of the "material breach."  There is no allegation that it did.  Rather, it is apparent from the allegations regarding the continued efforts of Immunomedics to resolve the dispute per the terms of the Agreement that it neither exercised its right to terminate the Agreement or even considered the Agreement to be terminated in any way.  As the Court observed earlier in this Opinion, the information Plaintiffs maintain was wrongfully concealed from the public concerns Immunomedics's dissatisfaction with Takeda-Nycomed's conduct.  Plaintiffs proffer no authority which would require this fact be disclosed under Rule 10b-5.

Because the Court has concluded that Plaintiffs do not allege that Defendants failed to disclose information that they were legally obligated to make known to the public, it need not reach Defendants' other arguments concerning the insufficiency of Plaintiffs' securities fraud claim.  The failure to plead this critical element of a Section 10(b) claim prevents Plaintiffs from stating a claim upon which relief can be granted.  For the reasons set forth above, the claim for securities fraud in violation of Section 10(b) and Rule 10b-5 will be dismissed.

### C.      Section 20(a) Control Person Claim

Section 20(a) of the Exchange Act "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of § 10(b)." Institutional Investors Group v. Avaya, 564 F.3d 242, 252 (3d Cir. 2009); see also 15 U.S.C. § 78t(a).  A Section 20(a) claim thus imposes secondary liability on the controlling person for the wrong committed by the one who is controlled. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284–85 (3d Cir.2006).  Plaintiffs' control person claim against Sullivan and Gorman is predicated upon the primary liability of Defendant Immunomedics under Exchange Act § 10(b).  Defendants argue that because the Complaint fails to state an actionable § 10(b) violation, the control person claim necessarily fails to state a claim upon which relief may be granted.  Defendants are correct.  Id. at 285; Shapiro v. UJB Financial Corp., 964 F.2d 272, 279 (3d Cir.1992) (holding that "once all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based.").  Accordingly, the control person claim will also be dismissed for failure to state a claim upon which relief may be granted.

18

## III.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss.  The Complaint will be dismissed in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs will, however, be granted leave to file a further amended Complaint so that they may have an opportunity to cure the pleading deficiencies discussed in this Opinion.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (holding that upon granting a defendant's motion to dismiss a deficient complaint, a district court should grant the plaintiff leave to amend within a set period of time, unless amendment of the complaint would be inequitable or futile).  An appropriate Order will be filed.


_____s/ Stanley R. Chesler_____
STANLEY R. CHESLER
United States District Judge

Dated: January 28, 2015